UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

          Plaintiff,

      v.                            Case No. 12-CR-241

RANDEZ LONG,

          Defendant.

## PLEA AGREEMENT

1.     The United States of America, by its attorneys, James L. Santelle, United States Attorney for the Eastern District of Wisconsin, and Matthew L. Jacobs, Assistant United States Attorney, and the defendant, Randez Long, individually, and by his attorney, James E. Toran, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGES

2.     The defendant has been charged in all six counts of a six-count indictment, which charges Long with wire fraud, in violation of Title 18, United States Code, Section 1343 (counts one and two), bank fraud, in violation of Title 18, United States Code, Section 1344 (counts three- five), and money laundering, in violation of Title 18, United States Code, Section 1957 (count six).

3.     The defendant has read and fully understands the charges contained in the indictment. He fully understands the nature and elements of the crimes with which he has been charged, and those charges and the terms and conditions of this plea agreement have been fully explained to him by his attorney.

4.      The defendant voluntarily agrees to plead guilty to the charges in counts four and six of the indictment, a copy of which is attached to this plea agreement as Exhibit A.

5.      The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offenses set forth in counts four and six of the indictment. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the following facts beyond a reasonable doubt. The defendant admits that these facts are true and correct and establish his guilt beyond a reasonable doubt:

This prosecution stems from an investigation into a series of real estate transactions involving Randez Long ("Long") who, at the time, was living in Wisconsin. Long operated several businesses in the Milwaukee area that were involved in buying and selling residential properties. These included LM Management, LLC; RL & DL Properties, LLC; RA & BB Properties, LLC; S.C. & Long Properties, LLC; R & B Mortgage, LLC; Long and Reed Property Management, LLC; and Long Management, LLC.

The investigation revealed that, during the period from January 2005 through April 2008, Long, and others working with him and at his direction, purchased or sold approximately 35 residential properties all located in the Milwaukee area. Some of these properties were bought and sold more than once. In particular, Long purchased at least eleven properties in his sister's name and an additional seven properties in his mother's name, both of whom were actually living in Georgia.

The purchases were typically financed through mortgage companies or federally insured banks, including Countrywide Bank, Fsb, which later became part of Bank of America; Washington Mutual Bank, FA, which later became part of JP Morgan Chase Bank, National Association; and Southport Bank, which is located in Kenosha, Wisconsin. Long, and others working with him and at his direction, prepared and submitted to prospective lenders loan applications that reflected false and fraudulent information concerning the borrower's employment, income, and assets. Long and others working with him also provided prospective lenders with false and fraudulent documents purporting to verify the borrower's employment, income, and assets.

On many of the real estate transactions, Long inflated the purchase price. This enabled Long to divert a significant portion of the proceeds from the sale to himself (or to an entity he controlled) despite the fact that Long represented the buyer

2

in these transactions. Long also frequently provided the funds that the nominal buyer was supposed to contribute to the purchase.

With respect to some of the properties, Long, and others working in concert with him and at his direction, notified the lender that the borrower was unable to pay the loan and was attempting to sell the property for an amount substantially less than the amount owed to the lender. The borrower would propose a "short sale" in which the borrower would sell the property for an amount substantially less than the amount owed and the lender would agree to accept less than the full amount it was owed.

Long, and others working in concert with him and at his direction, provided lenders with false and fraudulent documents, including offers to purchase and settlement statements. These documents falsely represented that the borrower sold the property for an amount substantially less than the amount owed to the lender. In fact, these "short sales" were fictitious and never occurred.

At the same time, Long, and others working in concert with him and at his direction, fraudulently arranged to sell the property to a third party for an amount substantially greater than the amount represented to the lender.

To finance this second sale, Long, and others working in concert with Long and at his direction, fraudulently applied for and obtained new loans from other lenders. Long, and others working with him and at his direction, provided the new lenders with false and fraudulent information concerning the new borrower's employment, income, and assets. Long, and others working in concert with him and at his direction, also provided the new lenders with false and fraudulent documents purporting to verify the new borrower's employment, income, and assets.

Long's fraud is reflected in the transactions associated with the two properties identified in the indictment, which are located at 3442 North 12th Street and 3132 North 25th Street, both in Milwaukee.

<u>3132 North 25th Street</u>

On or about August 10, 2005, Long purchased a single-family residence located at 3132 North 25th Street in his sister's name ("S.L.") for $69,000. To pay for it, Long applied for and obtained a loan in his sister's name from Argent Mortgage Company, LLC in the amount of $62,100. The loan application used to obtain this loan falsely indicated that Long's sister had a bank account at Bank One with a balance of $17,000. The indicated account is actually maintained in the name of a business Long operated (LM Management) and he is the only signatory on the account.

3

In addition, the settlement statement indicates Long's sister brought $9,712.25 to the closing. This money actually came from Long. Finally, even though Long's sister was the purchaser of the property, $48,200 from the sale proceeds were actually paid to LM Management, LLC, a business controlled by Long. The funds were deposited to the account Long maintained at Bank One listed on the loan application completed in his sister's name referenced above.

In July 2007, a letter purporting to be from Long's sister was sent to Citi Residential Lending, Inc., which then held the mortgage loan for the 25th Street property, and proposed a short sale because Long's sister claimed to be "unemployed with no income"and unable to pay the loan because of the "market crashing." Long later provided Citi Residential with a series of offers to purchase and settlement statements proposing to sell the property to G.S. for $33,000.

Ultimately, on December 7, 2007, Long faxed a settlement statement from a title company in Elm Grove to Citi Residential in California indicating that his sister had sold the property to "RL & DL Properties, LLC" for $30,000. This is a business operated by Long ("RL") and a second individual ("DL"). According to the settlement statement, Long's sister (even though she was the seller) contributed $4,600 to the sale so Citi Residential would receive $30,969.15, which it agreed to accept as payment in full for her loan. This fax forms the basis of the wire fraud charge in count one.

On December 10, 2007, these funds were wired from Milwaukee to Citi Residential's bank account in New York. The funds came from Long's actual sale of the 25th Street property described below. This wire forms the basis of the wire fraud charge in count two.

In fact, on December 7, 2007, the same day the property was supposedly sold to RL & DL Properties, LLC for $30,000 as part of a short sale, Long arranged the sale of the 25th Street property to another individual recruited by Long (L.B.) for $97,000. The purchase was financed with a $87,300 loan from Countrywide Bank, Fsb. The loan application submitted to obtain this loan falsely indicates that L.B., who was then a student, had stock and bonds worth $15,000 and would be contributing $15,339.93 to the purchase. Fraudulent account verifications were also submitted as part of the loan application. This loan forms the basis of the bank fraud charge in count three.

The settlement statement indicates that, after paying $30,969.15 to pay off the previous mortgage as part of the fraudulent short sale, Long's sister received $45,017.36. This money went to an account controlled by Long ("SC & Long Properties").

4

<u>3442 North 12th Street</u>

On September 21, 2005, Long purchased a single-family home located 3442 North 12th Street in his sister's name for $82,000. To pay for it, Long obtained a $73,800 loan in his sister's name from Long Beach Mortgage Company. The loan application used to obtain this loan falsely indicated that Long's sister had a bank account at Bank One with a balance of $17,000. Again, the indicated account is actually maintained in the name of a business Long operated (LM Management) and he is the only signatory on the account.

The settlement statement indicates Long's sister brought $11,378.12 to the closing. This money actually came from Long. Finally, even though Long's sister was the purchaser, $38,515 from the sale proceeds went to Long as "Fees to LM Management." The seller denies knowing anything about this payment and said he understood that the sale price was only $44,000.

In July 2007, Long contacted Washington Mutual Bank ("WAMU"), which then held the mortgage loan for the 12th Street property, and proposed a short sale because Long's sister claimed to be "unemployed with no income"and unable to pay the loan because of the "market crashing." Long (posing as his sister) later provided WAMU with an offer to sell the property to D.L. for $39,000 and assured the bank that S.L. would receive nothing from this sale. Finally, on March 4, 2008, S.L. provided WAMU with a settlement statement indicating she had sold the property to D.L. for $39,000, that WAMU would be paid $35,618.14 from this sale, and that she received $0. Based on this sale, WAMU agreed to accept the short sale as full payment for its loan. This transaction forms the basis of the bank fraud charge in count 5.

In fact, on February 29, 2008, Long (again posing as his sister) sold the property for $90,000 to G.S., who Long had recruited. To finance this purchase, Long obtained a loan for G.S. from Southport Bank, which is federally insured, in the amount of $85,500. To obtain this loan, Long prepared an application falsely indicating G.S. was employed at Primerica making $5,000 per month and had a bank account at Chase Bank with a balance of $9,500. Fraudulent documents, including a paystub, employment verification, and account verification (also from Primerica) were submitted with the loan application. This loan forms the basis of the bank fraud charge in count 4. In addition, because this sale closed on February 29, 2008, Long's sister did not even own the property when she supposedly sold it to D.L. on March 4, 2008 for $39,000.

The settlement statement reflects that Long's sister received approximately $80,000 from this sale. This money went into Long's account.

5

On April 14, 2008, Long used $10,125 from these proceeds to purchase a bank check, which he used to purchase another property in his own name. This transaction forms the basis of the money laundering charge in count six.

Based on the properties Long bought and sold as part of his scheme, including the properties located at 3442 North 12th Street and 3132 North 25th Street, Long caused a loss that was more than $400,000 but less than $1 million.

This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, this offense.

## PENALTIES

6.     The parties understand and agree that the offenses to which the defendant will enter a pleas of guilty carries the following maximum term of imprisonment, fine, and term of supervised release to follow any term of confinement: Count Four: 30 years, a $1 million fine, and up to five years of supervised release; Count Six: 10 years, a $250,000 fine, and up to three years of supervised release. Each count also carry a mandatory special assessment of $100. The parties further recognize that a restitution order may be entered by the court. the parties' acknowledgments, understandings, and agreements with regard to restitution are set forth in paragraph 27 of this agreement.

7.     The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney.

## DISMISSAL OF REMAINING COUNTS

8.     The government agrees to move to dismiss the remaining counts of the indictment at the time of sentencing.

6

## ELEMENTS

9.     The parties understand and agree that in order to sustain the charge of bank fraud, in violation of 18 U.S.C. § 1344, as set forth in count four of the indictment, the government must prove each of the following propositions beyond a reasonable doubt:

> First, there was a scheme to defraud one or more banks, or to obtain money from a bank by means of false and fraudulent pretenses, representations, or promises, as charged;
>
> Second, that the scheme involved misrepresentations or deceptions concerning a material matter;
>
> Third, that the defendant executed or carried out the scheme, as charged in a particular count;
>
> Fourth, that the defendant did so knowingly and with the intent to defraud; and,
>
> Fifth, that at the time of the charged offense, the deposits of the bank in question were insured by the Federal Deposit Insurance Corporation.

10.     The parties further understand and agree that in order to sustain the charge of money laundering, in violation of 18 U.S.C. § 1957, as set forth in count six of the indictment, the government must prove each of the following propositions beyond a reasonable doubt:

> First, the defendant engaged in a monetary transaction, involving the deposit, withdrawal, transfer or exchange, of funds or a monetary instrument, by, through, or to a financial institution;
>
> Second, that the transaction affected interstate commerce;
>
> Third, that defendant knew the transaction involved criminally derived property;
>
> Fourth, the property had a value greater than $10,000;
>
> Fifth, the property was derived from bank fraud; and
>
> Sixth, the transaction occurred in the United States.

7

## SENTENCING PROVISIONS

11.     The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

12.     The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

13.     The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offense set forth in paragraph 4. The defendant acknowledges and agrees that his attorney in turn has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

14.     The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

### Sentencing Guidelines Calculations

15.     The parties acknowledge, understand, and agree that the sentencing guidelines calculations included in this agreement represent the positions of the parties on the appropriate sentence range under the sentencing guidelines. The defendant acknowledges and understands that

8

the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

### Relevant Conduct

16.     The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offense to which the defendant is pleading guilty.

17.     The parties agree that, for purposes of determining the defendant's offense level under the sentencing guidelines, the loss amount associated with the defendant's criminal conduct is more than $400,000, but less than $1 million.

### Base Offense Level

18.     The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in count four is 7 under Sentencing Guidelines Manual § 2B1.1(a)(1).

### Specific Offense Characteristics

19.     The parties agree to recommend to the sentencing court that the defendant's base offense level should be increased 14 levels under Sentencing Guidelines Manual §2B1.1(b)(1)(H) based on their agreement that the loss amount resulting from the defendant's criminal conduct is more than $400,000 but less that $1 million.

9

### Money laundering enhancement

20.     The parties acknowledge and understand that the government will recommend to the sentencing court that the defendant's offense level should be increased one level under Sentencing Guidelines Manual § 2S1.1(b)(2)(A) because the defendant will also be convicted under 18 U.S.C. § 1957, as charged in Count Six of the indictment.  The defendant has reserved the right to argue against such an increase to his offense level.

### Role in the Offense

21.     The parties acknowledge and understand that the government will recommend to the sentencing court that the defendant's offense level should be increased two levels under Sentencing Guidelines Manual § 3B1.1(c) because the defendant was an organizer, leader, manager or supervisor in the charged criminal conduct.  The defendant has reserved the right to argue against such an increase to his offense level.

### Acceptance of Responsibility

22.     The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility.  In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

10

## Sentencing Recommendations

23.     Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

24.     Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

## Court's Determinations at Sentencing

25.     The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 6 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

26.     The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

27.     The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction.  The defendant agrees not to request any delay or stay in payment of any and all financial

11

obligations. If the defendant is incarcerated, the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the Court specifically directs participation or imposes a schedule of payments.

28. The defendant agrees to provide to the Financial Litigation Unit (FLU) of the United States Attorney's Office, upon request of the FLU during any period of probation or supervised release imposed by the court, a complete and sworn financial statement on a form provided by FLU and any documentation required by the form.

<u>**Special Assessment**</u>

29. The defendant agrees to pay the special assessments in the amount of $200 prior to or at the time of sentencing.

<u>**Restitution**</u>

30. The defendant agrees to make full restitution to the victims of his fraud. The defendant understands that because restitution for the offense to which he will plead guilty is mandatory, the amount of restitution shall be imposed by the court regardless of the defendant's financial resources. The defendant agrees to cooperate in efforts to collect the restitution obligation. The defendant understands that imposition or payment of restitution will not restrict or preclude the filing of any civil suit or administrative action.

<u>**DEFENDANT'S WAIVER OF RIGHTS**</u>

31. In entering this agreement, the defendant acknowledges and understands that in so doing he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

12

a.　　If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

b.　　If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

c.　　If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

d.　　At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

e.　　At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

32.　　The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant

13

intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

33.     The defendant acknowledges and understands that he will be adjudicated guilty of the offenses to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

34.     The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

## Further Civil or Administrative Action

35.     The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

14

## MISCELLANEOUS MATTERS

36.     The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

37.     The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

38.     The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

39.     The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

40.     The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this

15

agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## VOLUNTARINESS OF DEFENDANT'S PLEA

41.     The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 3/29/13

RANDEZ LONG
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 3/29/13

JAMES E. TORAN
Attorney for Defendant

For the United States of America:

Date: 3/29/13

JAMES L. SANTELLE
United States Attorney

Date: 3/29/2013

MATTHEW L. JACOBS
Assistant United States Attorney

17

UNITED STATES OF AMERICA,

Plaintiff,

2012 NOV 14 P 1: 28

JON W. SANFILIPPO
CLERK

SEALED
Unsealed 12/3/12

12 -CR 241

v.

Case No. _____

[18 U.S.C. §§ 1343, 1344, and 1957]

RANDEZ LONG,

Defendant.

**I N D I C T M E N T**

## THE GRAND JURY CHARGES:

### Allegations common to all counts

1.      Beginning in approximately 2005, and continuing thereafter until approximately April 2008, the exact dates being unknown to the grand jury, in the State and Eastern District of Wisconsin, and elsewhere,

### RANDEZ LONG

devised and carried out a scheme to defraud and to obtain money by means of material false and fraudulent pretenses, representations, and promises (the "scheme"), which scheme is described more fully below.

2.      Long's scheme included a scheme to defraud financial institutions, whose deposits were insured by the federal government through the Federal Deposit Insurance Corporation ("FDIC"), and to obtain money from such financial institutions by means of material false and fraudulent pretenses, representations, and promises.



EXHIBIT

A

3. For purposes of executing the scheme, Long, and others working in concert with Long and at his direction, used and caused the use of interstate wire communications, the United States mail, and commercial interstate carriers.

4. At all times relevant to this indictment:

    a. Randez Long ("Long") resided in Wisconsin, and operated several businesses in the Milwaukee area, including LM Management, LLC; RL & DL Properties, LLC; RA & BB Properties, LLC; S.C. & Long Properties, LLC; R & B Mortgage, LLC; Long and Reed Property Management, LLC; and Long Management, LLC.

    b. The deposits of the following financial institutions were insured by the federal government through the FDIC:

        i. Countrywide Bank, Fsb, which later became part of Bank of America.

        ii. Washington Mutual Bank, FA, which later became part of JP Morgan Chase Bank, National Association.

        iii. Southport Bank, Kenosha, Wisconsin.

### The Scheme

5. Long's scheme to defraud and to obtain money by means of material false and fraudulent pretenses, representations, and promises was essentially as follows:

    a. Long recruited individuals, including his mother and sister, to purchase residential real estate in the City of Milwaukee.

    b. To finance the purchase of property, Long, and others working in concert with Long and at his direction, fraudulently applied for and obtained loans

2

from various lenders, including Countrywide Bank, Southport Bank, and other federally insured financial institutions.

c.    To obtain the loans, Long, and others working in concert with Long and at his direction, provided lenders with false and fraudulent information concerning the borrower's employment, income, and assets.

d.    Long and others working with Long and at his direction, provided lenders with false and fraudulent documents purporting to verify the borrower's employment, income, and assets.

e.    Long obtained a substantial portion of the proceeds from the purchase of the properties.

f.    After purchasing the residence, the borrower made few if any payments on the loan and frequently defaulted on the loan.

g.    Long, and others working in concert with him and at his direction, notified the lender that the borrower was unable to pay the loan and was attempting to sell the property for an amount substantially less than the amount owed to the lender.

h.    The borrower requested that the lender agree to a "short sale," in which the borrow would sell the property for an amount substantially less than the amount owed and the lender would agree to accept less than the full amount it was owed.

i.    Long, and others working in concert with Long and at his direction, provided lenders with false and fraudulent documents, including offers to purchase and

3

settlement statements. These documents falsely represented that the borrower sold the property for an amount substantially less than the amount owed to the lender. In fact, these "short sales" were fictitious and never occurred.

j.    At the same time, Long, and others working in concert with Long and at his direction, fraudulently arranged to sell the property to a third party for an amount substantially greater than the amount represented to the lender.

k.    To finance this second sale, Long, and others working in concert with Long and at his direction, fraudulently applied for and obtained new loans from other lenders.

l.    Long, and others working with Long and at his direction, provided the new lenders with false and fraudulent information concerning the new borrower's employment, income, and assets.

m.    Long, and others working in concert with Long and at his direction, also provided the new lenders with false and fraudulent documents purporting to verify the new borrower's employment, income, and assets.

n.    As a result of this second sale of the property, Long again received a substantial portion of the sale proceeds.

6.    As a result of his scheme, Long fraudulently obtained more than $1 million.

4

## COUNTS ONE AND TWO
### (18 U.S.C. § 1343)

THE GRAND JURY FURTHER CHARGES:

7.      All of the allegations set forth above in paragraphs 1 - 6 of this indictment are hereby incorporated in support of the following charges as if set forth in full here.

8.      On or about the dates indicated, in the State and Eastern District of Wisconsin, and elsewhere,

### RANDEZ LONG,

for the purpose of executing his scheme and attempting to do so, knowingly transmitted and caused to be transmitted in interstate commerce the described wire communication from Wisconsin to the indicated location.

| Count | Date | Description of interstate wire communication |
|-------|------|---------------------------------------------|
| One | December 7, 2007 | A facsimile ("fax") transmission of a settlement statement sent from Elm Grove, Wisconsin, to Citi Residential Lending, Inc., in Rancho Cucamonga, California. At that time, Citi Residential Lending held the mortgage loan S.L. had previously obtained to purchase this property. The settlement statement falsely reflected that Long's sister (S.L.) sold the residence located at 3132 North 25th Street, Milwaukee, to RL & DL Properties, LLC, for $30,000. |
| Two | December 10, 2007 | A wire transfer of funds in the amount of $30,969.15 from Milwaukee, Wisconsin, to an account belonging to Citi Residential Lending, Inc., at Bank of America, in New York. These funds purported to be the proceeds of the "short sale" of the residence located at 3132 North 25th Street, Milwaukee, Wisconsin, by S.L. In fact, these funds were from the proceeds of the sale of the residence to another party for $97,000. |

All in violation of Title 18, United States Code, Sections 2 and 1343.

5

## COUNTS THREE - FIVE
### (18 U.S.C. § 1344)

**THE GRAND JURY FURTHER CHARGES:**

9.      All of the allegations set forth above in paragraphs 1 - 6 of this indictment are hereby incorporated in support of the following charges as if set forth in full here.

10.      On or about the indicated dates, in the State and Eastern District of Wisconsin, and elsewhere,

### RANDEZ LONG

knowingly executed and attempted to execute his scheme to defraud, which included a scheme to defraud federally insured financial institutions, in the manner described:

| Count | Date | Description of execution of scheme |
|-------|------|-------------------------------------|
| Three | December 7, 2007 | Long, and others working in concert with Long and at his direction, fraudulently obtained a $87,300 loan in the name of L.B. from Countrywide Bank to purchase the residence located at 3132 North 25th Street, Milwaukee, Wisconsin.  To obtain this loan, Long, and others working with him and at his direction, prepared and submitted to the bank a loan application containing false and fraudulent information concerning L.B.'s employment, income, and assets, and provided fraudulent documents purporting to verify this false information. |
| Four | February 29, 2008 | Long, and others working in concert with Long and at his direction, obtained a $85,500 loan in the name of G.S., from Southport Bank to purchase the residence located at 3442 North 12th Street, Milwaukee, Wisconsin.  To obtain this loan, Long, and others working with him and at his direction, prepared and submitted to the bank a loan application containing false and fraudulent information concerning G.S.'s employment, income, and assets, and provided fraudulent documents purporting to verify this false information. |

6

| Count | Date | Description of execution of scheme |
|-------|------|-----------------------------------|
| Five | March 4, 2008 | Long, and other working in concert with Long and at his direction, fraudulently induced Washington Mutual Bank to accept substantially less money than the bank was owed on a home mortgage loan obtained in the name of Long's sister (S.L.) to purchase the residence located at 3442 North 12th Street, Milwaukee, Wisconsin. Long, and others working with him and at his direction, submitted a fraudulent settlement statement and other documents to the bank that made it appear that S.L. was selling the residence for $39,000, which was substantially less than the outstanding amount of the loan. In fact, the residence had already been sold for $90,000. |

All in violation of Title 18, United States Code, Sections 2 and 1344.

7

## COUNT SIX
(18 U.S.C. § 1957)

**THE GRAND JURY FURTHER CHARGES:**

11.     All of the allegations set forth above in paragraphs 1 - 6 of this indictment are hereby incorporated in support of the following charges as if set forth in full here.

12.     On or about April 14, 2008, in the State and Eastern District of Wisconsin,

### RANDEZ LONG

knowingly engaged and attempted to engage in a monetary transaction in criminally derived property of a value greater than $10,000, which property was derived from specified unlawful activity, namely Long's execution of his scheme to defraud charged in count 4 of this indictment, in that Long used proceeds from the sale of the residence located at 3442 North 12th Street, Milwaukee, Wisconsin, the purchase of which had been financed by a loan fraudulently obtained in the name of G.S., to purchase a bank check in the amount of $10,125 from JPMorgan Chase Bank, N.A. On that same day, Long used this check to purchase a residence located at 2310 West Keefe Avenue, Milwaukee, Wisconsin.

All in violation of Title 18, United States Code, Section 1957(a).

**A TRUE BILL:**

_____
FOREPERSON

Dated: _____

_____
JAMES L. SANTELLE
United States Attorney

8